# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| GARY LUNDGREN, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:12-263 |
| v. | ) | |
| | ) | Judge Kim R. Gibson |
| AMERISTAR CREDIT SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**I.     Introduction**

This matter comes before the court upon a motion for summary judgment (ECF No. 19) filed by Defendant Ameristar Credit Solutions, Inc.  Plaintiff, Gary Lundgren, filed a brief in opposition (ECF No. 25) and Defendant filed a reply (ECF No. 29).  For the reasons that follow, Defendant's Motion is granted in part as to Plaintiff's claims under 15 U.S.C. § 1125 (Counts I and II).  Further, the Court declines to exercise jurisdiction over Plaintiff's remaining state law claims of publicly placing a person in a false light, appropriation of Plaintiff's name and likeness, wrongful discharge for reasons against public policy, and breach of implied contract of employment (Counts III, IV, V and VI).

**II.    Jurisdiction and Venue**

The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.  Venue is proper pursuant to 28 U.S.C. § 1391(b).

**III. Factual Background**[1]

Defendant is a debt settlement and tax resolution business located in Johnstown, Pennsylvania. (ECF No. 21 at ¶ 1). Defendant was previously in the mortgage service industry and began offering tax resolution services in July 2010. (ECF No. 25-3 at 2). Plaintiff is an "enrolled agent" with the Internal Revenue Service ("IRS"). (*Id.* at ¶ 2). An enrolled agent is a person authorized to represent taxpayers before the IRS by either passing a three-part comprehensive IRS test covering individual and business tax returns, or through experience as a former IRS agent. (*Id.* at ¶ 2 n.1). Prior to his employment with Defendant, Plaintiff was employed by Freedom Tax Relief located in Sacramento, California. (ECF No. 32-2 at 8). According to Plaintiff, he was approached by Vice President Scott Geisel ("Geisel"), via email regarding possible employment opportunities with Defendant in response to information Plaintiff had posted with an online employment service. (*Id.* at 9-10). Following a telephonic interview with Geisel and President David Bassett ("Bassett"), Plaintiff was offered employment as an enrolled agent with Defendant, and accepted that offer on July 16, 2010. (ECF No. 22-3 at 2; ECF No. 32-2 at 9-10).

On July 18, 2010, Plaintiff executed various documents detailing the terms and conditions of his employment with Defendant ("Employment Agreement"). (ECF No. 22-4 at 2-24). Plaintiff acknowledged that he read and understood the documents before

---

[1] The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

signing them. (ECF No. 32-2 at 11). Among other things, Plaintiff's Employment Agreement provided:

> Employee acknowledges that Employee's employment is "at will", subject to applicable law, and that either Employer or Employee may terminate employment at any time, with or without notice, for any reason or no reasons whatsoever. Nothing in this Agreement shall constitute a promise of employment for any particular duration or rate of pay.

(ECF No. 22-4 at 7). The Employment Agreement further included a covenant whereby Plaintiff was precluded from engaging, either directly or indirectly, in competition with, or soliciting any customer, client or account of Defendant. (ECF No. 22-4 at 6).

According to Plaintiff, the Employment Agreement was not the entire agreement between the parties. At the time Plaintiff began working for Defendant, he had his own tax relief business servicing six to eight clients. (ECF No. 32-2 at 56). Plaintiff had operated this business as a sole proprietorship since 1991, and, in connection with this business, Plaintiff maintained a website and a PayPal account through which he accepted payments for his services.[2] (*Id.* at 56-57). Plaintiff maintains that Bassett agreed that he could continue to serve his own clients. (ECF No. 26 at 1). However, Bassett testified by deposition as follows:

> Q. And when he was hired, did you expect him to give up his customer referrals from past clients?
>
> A. Yes, of course. If he's coming to work for us, we would assume he's not running his own ---. The way he explained it to me was that he had a few clients that he was finishing up. And I said, I'm fine with you finishing up a few clients; what is that going to take, a few months, six months, go ahead and finish them up, that's fine, but not to

---

[2] PayPal is a "global e-commerce business allowing payments and money transfers to be made through the internet." *Bridgeforth v Dutta*, No. 12-cv-697-GMS, 2013 WL 1775514, at *1 n.1 (D.Del. April 24, 2013).

3

> take on new clients or to continue to solicit new business or run a competing business with ours.
>
> Q. So you were aware that he had an ongoing business with clients at the time he was hired?
>
> A. No, I was not. . . . I was aware that he had a business that he previously ran that he had to finish up. I was not aware that he was going to relocate to Pennsylvania and advertise and continue to run it. That would be in direct violation to what we agreed to. Why would I be okay with that?
>
> * * *
>
> Q. And so when you first interviewed him, you were aware that he had some clients; is that right?
>
> A. I believe the way he said it to me was he had two or three or four clients he had to finish up.
>
> Q. And what did you tell him?
>
> A. Go ahead and finish them up, there's no reason to drop the ball on them.

(ECF No. 22-1 at 9-11). Plaintiff continued to maintain his own business while employed by Defendant, but did not acquire any new clients between August 2010 and June 2012. (ECF No. 32-2 at 58).

Plaintiff moved from California to Johnstown, Pennsylvania and began working for Defendant on or about August 16, 2010. (ECF No. 21 at ¶ 8). At the time Plaintiff began his employment with Defendant, he was the only enrolled agent, although additional enrolled agents were subsequently hired. (ECF No. 32-2 at 14). In addition to the enrolled agents, case workers were also hired to process case information for enrolled agents to review. (*Id.* at 17-18). When Plaintiff first started with Defendant, he was

responsible for approximately 40 case files, and at one point had responsibility for 183 case files. (*Id.* at 20-21). Plaintiff testified that there was an average expectation to "turn over" or close a file within a 12-month period, although some cases took several months to process while others took several years. (*Id.* at 21).

In 2011, Plaintiff was asked if he was interested in participating in Defendant's advertising. (ECF No. 32-2 at 29). Plaintiff agreed to participate, since he felt it would further his own interests and the interests of Defendant. (*Id.* at 29, 31-32). On May 2, 2011, Plaintiff executed a document entitled "Talent Release Form" whereby he stated that he understood Defendant was producing a television commercial and that his name, title, likeness, image, and voice would be recorded for use in that advertisement. (ECF No. 22-6 at 2). The consent form stated, among other things:

> I hereby consent to any recording of myself on any medium whatsoever by AmeriStar, its agency, or producer.
>
> I authorize the use of such recordings without compensation and without notifying me for any commercial purposes by AmeriStar. This grant includes without limitation the right to edit, mix or duplicate and to use or re-use the Product in whole or part as AmeriStar may elect.
>
> * * *
>
> I expressly release and indemnify AmeriStar . . . from any and all claims known and unknown arising out of, or in any way connected with, the above granted uses and representations.
>
> The rights granted AmeriStar herein are perpetual and worldwide.

(ECF No. 22-6 at 2). Plaintiff acknowledged that he read and understood the release before signing it. (*Id.* at 31). According to Defendant, Plaintiff also signed a second release for the benefit of the media company that produced and distributed the

5

advertisement, DX Media Direct, although Plaintiff does not recall signing a second release. (ECF No. 22-7 at 10, ECF No. 32-2 at 32).[3]

Plaintiff was one of several employees included in the advertising spots produced by Buddy Vaughn ("Vaughn") from the agency, and Plaintiff appeared in one or two spots out of a total of four or five spots recorded by the advertising agency. (ECF No. 22-7 at 12, ECF No. 32-2 at 30). The advertising that included Plaintiff was on a "per-inquiry" basis, meaning that the media agency was only paid if a particular advertisement resulted in a telephone call from a potential client. (ECF No. 22-1 at 17-19, ECF No. 22-7 at 2-3). Vaughn testified that Plaintiff was not "all that great on camera," whereas the other employees were "very, very good on screen." (ECF No. 22-7 at 7, 15). According to Defendant, the advertisement featuring the Plaintiff was less successful than the advertisements featuring the other employees and, therefore, it ran less frequently. (ECF No. 22-1 at 17-18, ECF No. 22-7 at 8).

On May 11, 2012, Plaintiff and five other enrolled agents sent a letter to Patrick Riley ("Riley"), Defendant's Director of Quality Assurance, and made various suggestions with respect to Defendant's tax resolution operations. (ECF No. 22-8 at 2-4). One of the suggestions was to reduce the case load of the enrolled agents from a target of 150 cases to 75 to 100 cases. (*Id.* at 2). They also suggested that the current case managers undergo additional training. (*Id.* at 3). Shortly thereafter, on June 22, 2012, Defendant placed Plaintiff on unpaid administrative leave while Defendant conducted a complete review of his past and/or current caseload and his overall relationship with Defendant. (ECF No.

---

[3] The second release is not included in the summary judgment record.

22-9 at 2). According to Defendant, this review revealed that Plaintiff was not working within Defendant's productivity standards. (ECF No. 22-10 at 2).

On November 6, 2012, Plaintiff's employment with Defendant was terminated. (ECF No. 22-9). Included in the reasons for his termination were his alleged violations of the Non-Compete Agreement, Conflict of Interest Policy, and Employee Rules of Conduct. (*Id.*). On November 20, 2012, Plaintiff, through his counsel, requested that Defendant stop using his name and photograph in its advertising. (ECF No. 22-11 at 2). On November 29, 2012, Defendant confirmed that any advertising spots involving Plaintiff had been replaced and were no longer authorized to air. (ECF No. 22-12 at 2).

Based upon the preceding events, Plaintiff filed a complaint on December 31, 2012, alleging violations of the Lanham Act (Counts I and II), violations of his state law privacy rights (Counts III and IV), wrongful termination (Count V), and breach of an implied contract for employment (Count VI). (*See* ECF No 1). Defendant timely filed an answer on February 8, 2013. (ECF No. 8). All fact discovery was to be completed by September 19, 2013. (ECF No. 16). Presently pending before the Court is the Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 19). A supporting brief, concise statement of material facts, exhibits, a response to the concise statement of material facts, and a reply brief were also filed by the parties. (ECF Nos. 20-22, 25-27, 29). Accordingly, the matter is fully briefed and ripe for disposition.

**III.    Standard of Review**

Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n. 11 (1986)).

"For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).

**V.    Discussion**

Defendant seeks summary judgment on all of the claims asserted by Plaintiff. The Court will first address Plaintiff's Lanham Act claims at Counts I and II.

**A.    Lanham Act claims, 15 U.S.C. § 1125**

Section 1125(a) of the Lanham Act provides:

> **(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
>> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> **(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). "Section 1125(a) thus creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark Int'l, Inc. v.*

*Static Control Components, Inc.*, 572 U.S. __, __, 134 S.Ct. 1377, 1384 (2014). Plaintiff has alleged both in this case—he contends that Defendant engaged in false advertising by misrepresenting that he was an employee after he was terminated and that Defendant used his name and likeness in an advertisement endorsing Defendant's services.

As a threshold matter, Defendant argues that Plaintiff lacks prudential standing to pursue his Lanham Act claims, employing the five-factor test adopted by the United States Court of Appeals for the Third Circuit in *Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 234 (3d Cir. 1998). Under the *Conte Bros*. analysis, a court should consider the following factors in determining whether a plaintiff has standing under § 1125(a): (1) the nature of plaintiff's alleged injury; (2) the directness or indirectness of the asserted injury; (3) the proximity or remoteness of the plaintiff to the alleged injury; (4) the speculativeness of the damage claim; and (5) the risk of duplicative damages. *Conte Bros.*, 165 F.3d at 233. In the briefs filed in the instant case, both parties address the *Conte Bros*. test.

However, after the parties completed briefing in this case, the United States Supreme Court decided *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. __, __, 134 S.Ct. 1377, 1384 (2014), wherein the Court expressly rejected the *Conte Bros.* five factor test. In *Lexmark*, the plaintiff manufactured and sold laser printers and toner cartridges for its printers. *Id.* at 1383. Other businesses, called "remanufacturers," could acquire used Lexmark toner cartridges, refurbish them, and sell them in competition with those sold by Lexmark. *Id.* Lexmark preferred that its customers return their empty cartridges to it for refurbishment rather than selling them to a remanufacturer. *Id.*

Lexmark therefore developed a "prebate" program to encourage customers to purchase directly from Lexmark, offering discounted cartridges to customers who agreed to return used cartridges to the company. *Id.* Lexmark installed a microchip in its discounted cartridges in order to deactivate them when empty. *Id.* Defendant Static Control, a maker of component parts for refurbished Lexmark cartridges, developed a similar microchip, and Lexmark sued for copyright infringement. *Id.* at 1384. Static Control, in turn, counterclaimed for false advertising in violation of § 1125(a), alleging that Lexmark had undertaken a mass lettering campaign advising its customers that it was illegal to purchase Static Control's refurbished cartridges. *Id.*

The parties framed the issue before the Supreme Court of whether Static Control had a cause of action under the Lanham Act as one of "prudential standing." *Id.* at 1386. However, the Court reasoned that the question of whether a plaintiff fell within the class sought to be protected by § 1125(a) was not one of standing at all; rather, the question was one of statutory scope. *Id.* at 1386-88. Observing that there was a circuit split over how to address the standing issued under the statute, the Supreme Court explicitly rejected the multi-factored analysis adopted by the Third, Fifth, Eighth, and Eleventh Circuits; the "categorical test" adopted by the Seventh, Ninth, and Tenth Circuits; and the "reasonable interest approach" adopted by the Second Circuit. *Id.* at 1385, 1391. Instead, the Court held that "a direct application of the zone-of-interests test and the proximate-cause requirement supplies the relevant limits on who may sue" under § 1125(a). *Id.* at 1391.

11

In this regard, the Court held that a plaintiff falls within the statutory zone of interests for purposes of § 1125(a) when they "allege an injury to a commercial interest in reputation or sales." *Id.* at 1390. With respect to proximate cause, the Court held that a plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 1391. Accordingly, to maintain a cause of action under § 1125(a), "a plaintiff must plead (and ultimately prove), an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id.* at 1395. Because Static Control had alleged a decrease in sales as a direct result of Lexmark's false representations to consumers, the Court concluded that Static Control fell within the class of persons and entities authorized to assert a § 1125(a) claim. *Id.* This Court finds *Lexmark* controlling in the instant case.

Here, when viewed through the *Lexmark* lens, Plaintiff's Lanham Act claims fail. In this regard, the summary judgment evidence reveals that the *only* damages Plaintiff has alleged with any specificity relate to those in connection with his alleged wrongful termination, and not from any alleged Lanham Act violation. During discovery, Plaintiff identified his damages as follows:

> **INTERROGATORY NO. 2:** For each Count of the Complaint, identify all losses, expenses or damages you seek to recover including, without limitation in your description, the full itemized amount of money damages you seek, the manner in which that amount was calculated, and whether such money damages were for losses, expenses or damages actually suffered by you, together with a complete description of such losses, expenses or damages you actually suffered, and/or based upon a statutorily prescribed amount

of money damages, in which case identifying specifically any such statute upon which your claim for such damages is based.

**ANSWER:**
- Loss of income and health benefits through age 70, which we calculate to be $382,160.00. Based on previous earnings and based on what would have earned if still employed with AmeriStar Tax Centers.
- Health Insurance costs incurred at $82.30 per month since August 2012.
- Job seeking costs, estimated at $200.00
- Losses as consequences to depression
    - Loss of marriage. I married shortly after being discharged. Divorce has been filed and should be final by July 1, 2013.
- Isolation from my family (inability to visit family due to income loss)
- Relocation by to [sic] California, as there is not family here for me, and I have no employment. Estimated costs for relocation is $10,000.

(ECF No. 22-5 at 7).

Plaintiff's deposition testimony is equally devoid of any facts demonstrating an injury to his reputation or sales:

Q. Now, I have to ask you, how do you contend you were injured as a result of these ads that ran after June 2012?

A. Well, my reputation, particularly the guy here in Johnstown who saw me and was questioning me about that. Other people, colleagues who saw me. It just seems to—I'm not sure what the right words are– impede or whatever my image and who my alliance is with.

Q. How is it impeding your image?

A. Influences whether or not they can trust, I believe, what I say if they see me in other places, yet I'm practicing or trying to practice on my own.

(ECF No. 32-2 at 55).

Scattered throughout Plaintiff's brief are nothing more than conclusory allegations that he has suffered "damage to his reputation" and/or suffered "lost reputation and goodwill." (ECF No. 25 at 14-15). For example, Plaintiff vaguely argues that his reputation with the IRS has somehow been tarnished and he must "spend his time and money to protect his license." (ECF No. 25 at 12). However, Plaintiff has failed to cite to any record evidence in support of this contention, and the Court's own independent review of the summary judgment evidence does not substantiate this claim. At this stage of the proceedings, Plaintiff must present evidence to support his allegations. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (non-moving party may not rely merely upon bare assertions, conclusory allegations or suspicions).

Plaintiff further claims that the advertisements featuring him "were successful," "business grew," and that Defendant's gross receipts were approximately $5,440,000 per year. (ECF No. 25 at 4). In support of his claim that the ads featuring Plaintiff were successful, Plaintiff cites to the allegations in his complaint. (ECF No. 25 at 13). However, a party "may not rest upon mere allegations or denials of his pleading," Fed. R. Civ. P. 56(e), and cannot rely on those pleadings to create a material issue of fact for trial. Moreover, the unrebutted summary judgment evidence establishes that the ads featuring the Plaintiff were not as successful as the ads featuring other employees, and therefore Plaintiff's ad did not air as frequently. (ECF No. 22-1 at 17-18, ECF No. 22-7 at 8).

Plaintiff attempts to demonstrate injury by claiming that he has suffered a "financial loss" because he was not paid for being in Defendant's commercials. (ECF No. 25 at 12). However, this alleged "loss" is not encompassed within a Lanham Act claim

because there is simply no connection between the alleged loss and any alleged damage to Plaintiff's reputation and/or sales. Even assuming there is a connection, Plaintiff has failed to demonstrate the amount of loss actually incurred.

Finally, the summary judgment record is devoid of any evidence with respect to a loss or decrease in sales. In sum, a careful review of the record reveals that Plaintiff has failed to come forward with sufficient evidence raising a material issue of fact for trial as to whether he has suffered an injury to a commercial interest in his reputation or sales, thereby precluding summary judgment. *Lexmark*, 134 S.Ct. at 1390.[4] In light of this failure, Plaintiff cannot establish the necessary nexus for proximate cause. *See e.g. Ahmed v. Hosting.com*, __F. Supp. 2d __, __, 2014 WL 2925292 at *7 (D. Mass. 2014) ("A failure to establish standing also prohibits a claim for proximate causation, as [plaintiff] provides no means by which to assess whether such damage has occurred, and whether defendants' actions are the proximate cause of the damage. Without pleading facts that assert his claims fall within the zone of interest and demonstrate proximate causation, [plaintiff's] claims fail to establish standing under the *Lexmark* test."). Accordingly, Defendant's

---

[4] The Court recognizes that the *Lexmark* decision addressed a false advertising claim and not a false association claim. *See Ahmed v. Hosting.com*, __F. Supp. 2d __,__, 2014 WL 2925292 at *6 (D.Mass. 2014) (noting it was unclear whether the Supreme Court's holding extended to false association claims and assumed, without deciding, that *Lexmark* applied). The Court also assumes, without deciding, that *Lexmark* applies to a false association claim. This Court notes that the Court of Appeals for the Third Circuit previously held that, for purposes of the standing analysis, there was no distinction between the two types of actions. *Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 234 (3d Cir. 1998), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. __, __, 134 S.Ct. 1377, 1384 (2014).

motion for summary judgment with respect to Plaintiff's Lanham Act claims (Counts I and II) will be granted.[5]

### B. State law claims

The Court's jurisdiction is predicated on original jurisdiction over the Lanham Act claims and supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(a). Plaintiff's remaining claims for publicly placing a person in a false light (Count III), appropriation of Plaintiff's name and likeness (Count VI), wrongful discharge for reasons against public policy (Count V), and breach of implied contract of employment (Count VI) all arise from Pennsylvania state law. Because the Court grants Defendant's motion for summary judgment as to Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's pendent state law claims and will dismiss those claims without prejudice. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (holding that when federal causes of action are dismissed, federal courts should not separately entertain pendent state claims); *Bartow v. Thomas*, No. 3:13-cv-271, 2014 WL 2993786, at *6 (W.D. Pa. July 2, 2014).

---

[5] In light of our conclusion that summary judgment is appropriate under *Lexmark*, Plaintiff's motion for leave to request an opportunity to file documents out of time (ECF No. 30) will be denied as moot.

## V. Conclusion

For the reasons stated above, Defendant's motion for summary judgment will be granted in part. Judgment will be entered in favor of Defendant as to Plaintiff's Lanham Act, 15 U.S.C. § 1125(a), claims (Counts I and II). The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims (Counts III, IV, V, and VI) and these claims will be dismissed without prejudice. The Clerk of Court will be directed to close this case.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARY LUNDGREN,<br><br>      Plaintiff,<br><br>v.<br><br>AMERISTAR CREDIT SOLUTIONS, INC.,<br><br>      Defendant. | Civil Action No. 3:12-263<br><br>Judge Kim R. Gibson |

## ORDER OF COURT

**AND NOW**, this 18th day of August, 2014, upon consideration of Defendant's motion for summary judgment (ECF No. 19), and in accordance with the accompanying memorandum opinion,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is **GRANTED** in part. **JUDGMENT is hereby entered** in favor of Defendant, AmeriStar Credit Solutions, Inc., and against Plaintiff, Gary Lundgren, as to Plaintiff's 15 U.S.C. § 1125(a) claims (Counts I and II).

**FURTHER**, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and hereby **DISMISSES** these claims (Counts III, IV, V, and VI) **without prejudice**.

**IT IS FURTHER ORDERED** that Plaintiff Gary Lundgren's motion for leave to file documents out of time (ECF No. 30) is **DENIED** as moot.

**IT IS FINALLY ORDER** that the Clerk of the Court shall mark this case closed.

BY THE COURT:

/s/ Kim R. Gibson

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE